We're going to hear this one case, and then we're going to take a quick quick break, and I'm going to skedaddle to another courtroom. I'm going to enter the transfer portal and go next door. And Judge Ho is going to slide over into the middle seat, and then we'll pick up again for case two. So, just that bit of housekeeping. All right, so we're going to hear 23-20516 Great Lakes Dredge and Dock Company v. Magnus. So, whenever you're ready. Mr. Longstreth? Yes, thank you. All right, take it away. And I'm representing the plaintiff appellate Great Lakes Dredge and Dock Company. Customs and Border Patrol, the agency that issued the ruling at issue in this case, fully agrees that Great Lakes has standing to pursue its claim. Well, you say they've – so, sorry to interrupt, but you say they fully agree, but they don't fully agree. The CPB has a different standing theory, a narrower standing theory than your theory, as I read the briefs. Yeah, well, to finish the sentence, they fully agree we have standing, so I guess we can agree with that. They fully agree we have standing. As to the difference in theory, they mentioned at the end of their discussion, we have five or six pages supporting our standing, that they thought one of the cases we cited from the D.C. Circuit had too broad a theory of standing. Okay, so they say – here's how I read it. But we don't need to go there. Here's how I read the briefs. They say your theory is too broad because you say, I needed this letter ruling to plan my business in the future because I'm going to go into this – I don't know what you want to call it, the rock ferrying business for wind farms. And we need to know whether we're going to be subject to foreign flagged competition. And so we need to be able to challenge this letter ruling because we need competition. Okay, got it. So it's sort of broad. As I understand it, the government's theory is narrower that the ruling letter has sort of precedential effect, I guess. I don't know if that's the right term, in identical transactions, identical cases. So, I mean, is that right? I'm just trying to understand. The parties are all over the place on standing. That's an alternative ground of standing. Well, the government only says that one. Well, I think I would go further than that. No, I think the government goes further than that, Your Honor, because they do say – and if you look at page 21 and 22 of their brief, they're very, very clear on the fact that parties such as Great Lakes need clarity to plan their future events. And that's the whole reason they have their system of prospective transactions. It's very clear that their rulings apply. Well, sure, but isn't there a distinction between being able to request a letter ruling and then being able to go into federal district court to challenge it under the APA? Yeah, but it's very clear under the – yes, you don't need Article III standing in the agency. That's, of course, true. But it's very clear from the precedent we've cited that we do have Article III standing. So let me just try to ask a pointed question instead of rambling all over the place, which I just did. So if the government is correct and you need to be able to point to identical transactions that this letter ruling is going to be precedential with respect to, where on the record can I look to see that there is evidence of that? Look at API's own motion to intervene. When they moved to intervene, they had to establish Article III standing. And that's one of the things that's very interesting about this case. They say we don't have standing, but they had to establish their own standing. Well, I agree with you. There is some tension there. We've got members who have got identical transactions. For example, they make a big deal about the fact their initial ruling letter back in February 2020, which under their theory somehow completely cab into the agency proceedings. But their view is, well, we mentioned the Martha's Vineyard Wind Project, and now that's already been let and there isn't one. When they moved to intervene, they said, look, we have people who have all kinds of projects. For example, they have one on Nantucket. Now, that's not Martha's Vineyard, but that's identical to Martha's Vineyard, and it doesn't even matter whether it's off Massachusetts or whatever. The legal issue here is absolutely the same, regardless of whether it's Martha's Vineyard or Nantucket or it's the Flintstone or it's the vessel that we're building in the Philly shipyard. The legal issue is, do you need a U.S. flag vessel to carry scour rock from a place in the United States to a point on the seabed? And that legal issue is absolutely the same, and we know it's absolutely the same because customs didn't say, oh, we're all confused about what's planning here. Customs didn't say, oh, is it an identical transaction? Customs knew exactly what we were planning. We're building a ship in the Philly shipyard to carry the scour rock. The ship is not hypothetical. We have all this stuff in API's brief about how hypothetical this is. The president of the United States went to our steel cutting when we were laying the vessel. The vessel is under construction. It's coming in next year. It is going to be carrying scour rock from one place in the United States to a point on the seabed, and it will either face unfair foreign competition. I'm sorry, illegal. I won't say it's unfair, but illegal foreign competition or it won't. What's the vessel called so we can call it something? Philly vessel. Arcadia. Arcadia. Okay. Arcadia. Arcadia.  So the Arcadia. Arcadia won't be able to participate in the vineyard project, will it? Yeah. I mean, look, in the four and a half years that this has been pending, that's come and gone. So it can't be the case that because that one specific project has come and gone, we now have to start over again and say, okay, well, now we're going to say Nantucket. Now we're going to say, you know, some other place on this shelf. That can't be the standard. Customs agrees that's not the standard. The case law has never said that. You're saying vineyard's over with, but the letter ruling is going to be precedential. At least the government's saying this. Precedential and other identical projects. And you're saying API itself has identified those. Absolutely. When they came in for their standing, they said, this is why our members care. And remember, they had to establish standing. They're in this unusual position where somehow they have standing and we don't, even though we're the person who got the letter ruling and we're the person who has the vessel that's going to come into the trade and be subject to this competition that, in our view of a statute, is illegal under the Jones Act. Can't possibly be right. I mean, due deference to the district judge, but, I mean, that can't be right. Okay. Clarifying question. So CBP, Customs, they rule that the Jones Act does not apply, correct me if I'm wrong, does not apply in situations in which the rock is transported from ports outside the U.S., like Canada, correct? That's right, because it only applies point to point in the United States. It's a cabotage rule within the United States. And do you agree that there's no evidence in the record that any of your competitors transport rock from inside the U.S.? Is that correct? Well, no, that's not correct at all. I mean, so, for example, we're out contracting now, right? You know, the vessel's going to come in. And that's another thing when they talk about perspective. So cite for me, what is, identify the record evidence, evidence in the record that shows that your competitors transport rock from inside the U.S.? Can you give me a record citation for that? I'll look for it, Your Honor. But there's no question that the ruling allows them to compete. I'm just wondering, what is the existing kind of U.S.-based supply chain for scour rock right now? Well, I mean, that's one thing that's interesting about the case and one reason why I think the ruling's so important. This is a nascent industry. I mean, you know, these offshore wind projects are just starting now. So the whole industry is kind of building up. Is there an existing incumbent U.S.-based supply market for scour rock? Well, no, no, no, the question is not that. What's the question I ask? Yeah, so the answer is I believe we are the only U.S.-based company. Great Lakes is the only U.S.-based company that's building one of these vessels. But the question is not whether there's a U.S. company. The whole point of this is a foreign-based company can come in and carry this rock if customs is overturned on this. Unless customs is overturned on this. I'm curious if this, I think. Right. I'm curious if your legal, if your standing theory is a purely legal one or is it a legal and evidentiary one? What I mean by that is you've said just now a few minutes ago that the ruling opens up the market to foreign competition. Right. Are you saying that's enough or do you acknowledge and agree that you have to present evidence of actual competitors? Well, I mean, first of all, I think that's enough because the case law says. Yeah, what's your best case for the proposition? You don't need any evidence. Just merely reciting the hypothetical exposure to competition is alone enough. Yeah. Well, first of all, I guess I'll say first of all, in terms of the record evidence, once again, I think we can turn to our friends at API. They are saying that the reason they want to come into the case and the reason they had standing in this case is they want to use foreign-flagged vessels to come in and carry this rock. And there's no question that there are these foreign-flagged vessels. We're competing against them right now. When we go out and compete for contracts, the competition against us is foreign-flagged vessels who are allowed by this ruling to come in. But on the question of law. Sir, slow down. Yeah. Do I take your answer to be then that you do have evidence of foreign competition and the evidence is sitting over there? Is that your point? That's one of the pieces of evidence, is the fact that they ruled when they moved in. And they put in a declaration saying we've got people who want to use these foreign-flagged vessels. Let me see. I can probably find the citation to that. But if you look at the declaration they filed with their motion to intervene, they say the reason we have standing is we have all these people who want to build these projects. And they want to use foreign-flagged vessels to come in and carry that. And if the customs ruling is overturned, we won't be able to use that. And that will cost us money. And that will destroy the nascent industry. The American Clean Power Association filed an amicus making all of these arguments, putting all of this in, that basically allowing these foreign vessels in, they're there. They want to use them. That's why they have standing. That's why they care. Because there are these foreign vessels who are going to come in and compete with us. So I think that's very clear from their own declaration. But going back to your question of law, I think if you look at the Cooper case, which is your precedent, and then all of the precedent we have in the D.C. Circuit. You rely on Cooper quite a bit. Is Cooper directly on all fours factually with this case? Is it just hypothetical future competition in Cooper? I can't recall for sure. But I do know that there is other precedent from this court that says standing does not require an immediate present harm as long as there is a certain enough prospective harm. And that case is ‑‑ sorry, I can't find it right now. But there is precedent on that prospective issue. So there's D.C. Circuit precedent in the competitor standing case that is directly on point. That's the EDF case, I think. Hold on for a second. Let me ‑‑ sorry. Well, there are two or three cases we cite from the D.C. Circuit. There's an environmental defense fund case. There are a couple others. I'm not sure we found a Fifth Circuit case in the competitor standing context. But we did find one in other standing context that says the harm doesn't have to be present. It can be future. Hypothetically, if you had a market where the barriers to entry were so high that there was no foreseeable ‑‑ I realize you don't think that's the case. Yeah, exactly. You had no foreseeable competitive threat. It's a purely hypothetical legal one under the issues presented in that case. But factually, I assume you would concede there's no standing there. Yeah, if there was absolutely no point. But, again, that's not ‑‑ There is a fact issue here, not just a legal one. Yeah, but it's a fact that's not really disputed because, as I said, API itself, in arguing for its own standing, said we have people who will have to pay more if they can't use these foreign fag vessels. There's no suggestion that it's hypothetical. And, in fact, if it were that hypothetical, API itself would not have had standing because they wouldn't have had the entry necessary to intervene. Because, again, they need Article III standing to intervene in the district court. What if the district court's ‑‑ I think it was the district court's concern that you guys aren't ready to compete right now? That your U.S. vessel is not ‑‑ Yeah, there's no case law that supports that. He didn't cite any ‑‑ the district judge didn't apply any cases. Well, but if you're not ready to participate in a market, then you can't be injured. But, well, there are two answers to that question, I guess. First of all, the fact that we are facing this competition down the road, in other words, next year, that's enough under this case law that I cited, you know, D.C. Circuit in the competitive area and your precedent otherwise. Second, we are injured now because we are out there competing for contracts right now. How do we know that? Once again, API put it in its brief. They cited, we cited reports that we had now let some contracts here, and they cited the fact that we now have contracts because you can't wait. The vessel's going to come next year. You can't wait until it hits the water to start competing for contracts. We've got to do that now. We've got a couple of contracts in place. We now have to, under the customs ruling, we have to compete with foreign competitors for those. So we have to, you know, we're facing this competition for those contracts we have. So we actually are suffering a present harm right now, but the case law says we don't have to be. To be clear, when we say competition, we mean foreign flagged vessels.  That would be transporting rock from a U.S. point to the OCS. Right, exactly, because in our view, that's a coastwise movement to a point, and that's the merits issue, to a point on the seabed, that's a Jones Act movement. Coast Guard says that's not a Jones Act movement unless there's already a layer of rock there. And since there's no layer of rock there, it's not a Jones Act movement. So, according to customs, it's perfectly fine for the foreigners to come here. Is it in the record, so since the vineyard project has been completed, is it in the record where that rock was sourced from? Because that would surely, if that rock was sourced from U.S. points, but it was done by foreign flagged vessels, then that would show competition. Yeah, I mean, I guess one of the things about the way the customs ruling works, and I think it's really one of the reasons that customs has conceded our standing here, is that the whole point of these rulings is to find out what's the law going to be. So I'm sitting here and I'm trying to figure out what's going to happen with these projects. So I can go to customs and say, look, if you say this is a Jones Act movement, I have to get my rock from Canada in order to come to this point on the seabed. If you say, customs, this is not a Jones Act movement, then I can source my rock from the United States. So the whole point of seeking the ruling is so that you know when you're making your plans, you know, sometimes years, two years, you build a vessel, that takes a couple years, you have certainty as to what the law is. Do I have to use a foreign flagged vessel to carry rock? I'm sorry, do I have to use a U.S. flagged vessel to carry rock from the United States to the point in the seabed? Or can I use a foreign flagged vessel to do that? And if customs says in the ruling, and it's a pure question of law for them, if they say that you have to use a U.S. flagged vessel, then I, if I'm one of API's members, can say, okay, well, then I better get my rock from Canada because I can't use the U.S. So, again, it's kind of contingent sometimes. Let me stop you. I'm sorry. The red light is blaring. Yeah, it is. That's why I'm talking so fast. But I am going to ask you one more question before you sit down, and then we'll hear from you again for five more minutes. Okay, thank you. So say we agree with you on the underlying merits of your APA claim. Can you explain, this kind of tags along to Judge Duncan's question, how would a favorable ruling from this court affect your competitors who scour rock from outside the U.S.? Okay, people who get rock from outside the United States and bring it in would be able to use foreign flagged vessels because that's not covered by the Jones Act, regardless of the letter ruling, because the Jones Act and Customs, the Jones Act only applies from one place in the U.S. to another. So anybody can come from Canada to this point on the U.S. shore, and this point on the U.S. OCS, the pristine point, as Customs puts it. Anybody can do that now. Nobody argues that's a Jones Act movement because it's coming from Canada, the United States. The only issue, and the issue they care about, and I keep coming back to it, the issue API cares enough about to send these people from D.C. to argue in front of you is they want to be able to take rock from the U.S. to the seabed with a foreign flagged ship. We've got a declaration. We'll hear more from you on rebuttal. Thank you very much. Feel free to have a seat, and we'll hear from one of those people from D.C., from the Justice Department, Ms. Lopez, whenever you're ready. Thank you. I have to adjust it down a little bit for myself. May it please the Court, Carolyn Lopez on behalf of the government, because of the way these cases come up, we want to make sure to focus on standing, though I'm happy to answer any other questions the Court may have. To begin with Judge Duncan's first question about sort of what the daylight is between the standard. So there is, in fact, daylight between the two standards, and I'm very glad that that came through in our brief. Under the government's view, there has to be a coastwise capable vessel that will be capable of participating either in the project at issue, in the ruling letter at issue, or in an established market of identical transactions. So that's the legal standard. And then to go to Judge Ho's question, that also does require some evidence in the record. And here, again, the government has taken, as I'm sure your honors are familiar, the somewhat unusual stance of saying that there is standing. We think there is enough evidence in the record because of what API has cited, and those particular sites, though we also would have no objection to a remand to the district court if this court does not agree that there's enough evidence. It's a little odd, I have to say. And I thought your brief was very clear, by the way, on this point, because I was asking myself, all right, how broad is this theory of competitors standing? And then your brief seemed to reign it in somewhat, a good bit. But it is a little odd for the answer to the question, and now I've heard it twice, to be where's the evidence in the summary judgment record for you to point to the other party and say, well, look at what they said. And it's a nice rhetorical point, and I was thinking about that, too. It's like what are they doing in the case if there's no harm to anybody, if there's no competition? But, I mean, can I look anywhere else beyond sort of the representations that the intervener made? So that's evidence in the record, which we, of course, scrutinize the record before taking this position, before this court, is that evidence brought in by API, and we think that's relevant because they introduced that evidence as relevant to the question of standing before the court. And so there we think the best evidence is that ROA 132, which is API's motion to intervene, where they identify four transactions of their members, which they say will be exactly like the one at issue at the ruling letter. And so that sort of is the identical transactions. And then as to some questions about whether or not there is sort of an existing U.S. scour, a place that U.S. scour can be sourced from, I think that question is actually also answered by evidence that API submitted. For example, at ROA 1789, that's where there's an identification that this Arcadia vessel is already under contract for 2025. So here we're talking about sort of is it going to be ready for sufficiently imminent things? So you're saying a contract that would be not permitted if the letter ruling were as it is right now? So I want to be very clear that I actually don't have access to that underlying. It's not part of the record, that underlying contract. So what I don't know is it answers the question of whether there's sort of an imminent source of U.S. scour. It does not answer the question, and I just don't know from the record. I assume it's sort of confidential and proprietary, and that's why they didn't introduce it, whether that's for sort of to transport that scour material for that second layer of scour material, which the ruling letter says quite clearly the Jones Act doesn't apply to. Do you know if we vacated the letter ruling as they request, is it your position that vacating the letter ruling would have no effect at all on API's ongoing wind farm projects? I mean, I don't know how they would structure those ongoing projects, but vacating the rule, so rather the only part of the rule, there are sort of multiple parts, so not at issue is the question of whether the Jones Act applies to that second layer of scour. If the court were to order that the Jones Act also applies to the first laying of the first layer of scour, which of course on the merits we disagree with heartily, then that would alter sort of consistent with the question this court laid out in Cooper, that would alter the competitive market by reimposing a view of the statute that bans certain competition, thereby altering the market. Back to standing. As part of the standing analysis, the district court kind of stressed the fact that Great Lakes did not yet have a completed Jones Act compliant vessel. Is it the government's position that we have to wait for them to finish a vessel? No, Your Honor, the vessel doesn't have to be completed, but the vessel has to be completed at the time the case first comes before the district court, but it has to be, the record has to indicate that the coast-wise vessel will be capable of competing for the sort of sufficiently imminent transaction in an established market. And so that, in our brief, we talked about there are sort of two, there's a pair of D.C. Circuit cases, so we think this falls into sort of the auto log bucket, which in auto log, the D.C. Circuit said there is this booming existing market that's been captured by foreign vessels. American sailors, you know, who would otherwise be able to compete for these, do have standing to challenge. So we think this is closer to the auto log bucket than the shipbuilders bucket, which we do think shipbuilders was wrong, but is entirely distinguishable from this case, because there the D.C. Circuit quite correctly said, look, it's not enough to have never asked for a ruling letter, asked for a transaction you were planning to compete in, and all you're telling us is someday we might build a boat. And so, you know, so that's why we think shipbuilders is distinguishable from here. But again, if the court thinks that there needs to be additional record evidence, we would have no objection to a remand to the district court for that. I'd like to ask you the difference. It seemed important, as I read through the briefs, the difference between a regulation that is promulgated by you and a ruling letter, that the ruling letter seems narrower than a regulation. Is that correct? Is that the right way to look at it? I think often, I mean, it would sort of depend on how an individual regulation were written. One could certainly imagine a regulation that was written only on a very specific – Narrower in the sense that, as I understand it, and please correct me if I'm wrong, the ruling letter applies to a prospective transaction and maybe identical – and the regulations regarding the binding nature of the ruling letters are quite clear and it has to be quite a tight fit to be an identical transaction. And that's why it matters, for example, whether – also because the Jones Act, of course, only applies when it's between two coast-wise points. But sort of, you know, so is it the same type of place that the material is being laded onto the vessel and is it the same type of place that it's being unladed? Is it the same type of merchandise? So quite a lot of factors have to line up such that it really – we're really talking about an identical market. That suggests a narrower standing, narrow window of standing to it to challenge a ruling. That's correct. And that's because that identical transaction creates a very tight idea of what the relevant market is that is bound by that ruling letter. If there are no further questions, I'm happy to sit. Thanks very much, Your Honors. Thank you. I want to hear from Mr. Brightbill representing the American Petroleum Institute. Yes, Your Honors. Thank you very much. And if I may, I plan to be your shell answer man on questions about the record here. So first of all, let me start off just by emphasizing many of these arguments that you're hearing were not presented to the district court below. In particular, this whole concept that there are identical transactions that could be the source of injury in standing. That was not argued to the district court below. That is waived. And it is very clearly established in this court's precedent that you can waive arguments in favor of jurisdiction because this court recognizes the district courts are busy. They've got a lot to do. And it's not normally this court's province to give litigants who didn't make their arguments below get out of jail free cards to go back and do it over again. So with that started, let me start with this issue of what AP. It would have been the government that made the identical point. Yeah, and Great Lakes never made it. It would have been the government below. That's right. But the government never made it below. Great Lakes never made it below. That whole theory of standing is completely waived and forfeited below. What was the theory of standing then below? It was this vineyard project. Competition for the vineyard project was going to ostensibly cause them injury. But, Your Honor, whether it's the identical projects, and I want to stress the difference between projects or transactions, okay, because that is a critical distinction. Yes, API has member affiliates who are doing similar projects to the vineyard wind. There is no record in this evidence, or there's no evidence in this record, that any competitor as ever in the past is now in the present or is imminently in the future going to transport scour protection rock from the United States to the U.S. outer continental shelf. In fact, Great Lakes in its own investor statements has bragged they're going to be the first, that they are creating the first U.S. supply chain for that purpose, and that is in the record at 1789. The existing rock comes from Canada. That's in the record of 1756. And so why it's critical to understand the difference between projects and transactions is you go, I've got it right here, we can read the declaration, you will not find any statement in the declaration or otherwise that any API affiliates are engaging in identical transactions, i.e., that are trying to transport the unlawful transaction, in their view, of rock from the United States to the outer continental shelf. It's not happening. It is not in this record. What they stated was that at the point of intervention, and by the way, it is not the law of the circuit nor any circuit that a defendant intervener needs to have independent standing to intervene. That's a misstep out of the box. But in terms of the interest, the interest was based on the fact that their complaint, and we can pull out their complaint and we can look at their prayer for relief and look at that at 19 of the record, was far broader. It sought a declaration that the Jones Act prohibits the transportation of scour rock to the seabed of the OCS by a non-coast-wide qualified vessel, whether or not there is already a first layer of rock attached to the seabed. Full stop. They thought, they came in seeking for a declaration that only coast-wise qualified vessels could transport rock to the outer continental shelf. And that unquestionably would have been a massive transformation of the law, which they've now walked away from. They also walked away from it in their opening brief. And it would have actually prohibited what is actually going on on the outer continental shelf, which is the lawful transportation, lawful by everyone's acknowledgement now, of rock from Canada to the outer continental shelf. That's what's in the records, Your Honor. Now, with respect to the case law, there's been a lot of debate about the case law. I don't think it's actually that hard. I think you can just go through every single one of these cases, and you will see a distinction, a clear distinction. In every case, whether it's competitive standing or environmental standing or what have you, they identify the plaintiff in order to have standing identifies some individual, some person, some competitor who either in the recent past has done the thing that they're saying is unlawful, is doing the thing that they're saying is unlawful, or imminently, substantial risk that that will imminently happen in the future. There are specific factual showings as to the competitors, and I noted the cases actually that they were referring to in their argument. The Cooper case, there in the Cooper case, you had out-of-state competitors who were in active competition for 20 years because the law preventing out-of-state competitors had been enjoined 20 years ago, and there was rampant out-of-state competition going on in the state of Texas. Why can't they point to you and your members? I take your point that intervener defendants don't have to have standing. It's more of a plaintiff thing. Yeah. But why can't they nevertheless use your facts? Because the only thing that they can point to, because it's the only thing that's going on, is that API members are engaged in similar projects, i.e., wind farm projects, but they are using rock from Canada. They don't have a declaration because it's not going on. They don't have any evidence that any other competitor is out there transporting rock from the United States to the Outer Continental Shelf. That is the specific transaction or form of transaction that they have said violates the Jones Act. Their complaint was broader. When we go and look at your declarations that they're pointing to, and I believe Ms. Lopez pointed to four particular projects or transactions, will we be able to tell from the record that none of that activity involves scour rock transported from the U.S. to the OCS? Our declarations say the following, injury. They do not address that question. What addresses that question in the record is Great Lakes' own admission that there is no U.S. rock supply chain, that they're in the process of creating the first and only sometime speculatively in the future, if that ever comes together, given how the economics of the wind industry have changed and cancellation of projects. What we have said specifically, and this is the penultimate sentence, 252 to 253 of the record, if the supply of vessels eligible to transport scour protection materials to the Outer Continental Shelf were limited to the single vessel under construction by Great Lakes Dredge and Docks, these and other planned wind projects could become either uneconomic or logistically impossible to compete. And because that is based on the fact that they were seeking a declaration to shut down all foreign competition to offshore wind, including rock from Canada. I read you the prayer for relief. That was the overbroad statement that they were asserting. We came in intervening, noting that was going to have an immediate, that would have an immediate detrimental impact on existing projects. There is no evidence in this record that granting the relief that they request, a ruling on their hypothetical that maybe somehow someday, if foreign competitors want to start taking rock from the United States directly to the Outer Continental Shelf, that's their specific theory of unlawfulness. That is what they need to demonstrate with evidence and didn't demonstrate with evidence is happening. And the evidence is actually to the contrary. What is the scenario where they can sue to challenge the letter ruling? If they're there, they're there can obviously convince the letter. The original letter ruling is correct. The revised one is wrong. What is the scenario where they can sue? You say it's not now. What would happen? Because I'm just thinking I want to avoid a scenario where the letter ruling is forever insulated from challenge.  And here's the scenario, Your Honor, which is that a foreign vessel is, begins to transport rock from the United States to the Outer Continental Shelf, or there is a specific imminent, to use the words of the Supreme Court in the, which, you know, as you know, the Supreme Court issued its two latest standing decisions at the end of the last term in June. I think both of them, FDA versus Alliance for Hippocratic Medicine, as well as Murthy v. Missouri, they're both standing cases where the standing was found not present to sue an agency over a third party. And I think both of them are instructive here. But the standard that they've articulated is that when you put these requirements together, actually this is the quote, putting these requirements together, the plaintiffs must show a substantial risk that in the near future at least one third party will act unlawfully, whatever that is, in response to the actions of the government. That's what they need to come forth and show with actual evidence that there is some foreign vessel out there that is imminently going to start carrying rock from the United States to the Outer Continental Shelf. They didn't present that evidence. By the way, they were challenged to present that evidence. We also, in our own brief, in our opening brief at summary judgment, we pointed out that, and this is Record of Appendix 1063, it, referring to Great Lakes, it has no stake in the Vineyard Project, it has not alleged any substantially identical transaction, and it will not have a vessel capable of doing such work for at least another year anyway. We challenged them to come forward with evidence to meet these theories. They did not do so. Okay, Mr. Brightbill, thank you. Thank you. Appreciate it. Mr. Longstreth, you're back for five minutes. Thank you. Keep an eye out for the red light. I'll have to activate the trap door. First, let's deal with some stuff that's just not true that he just said. This notion that their declaration was limited to Canadian rock, the threat that we were somehow going to apply this Canadian rock, we never said that, we would never say that. Everybody knows the Jones Act doesn't apply to Canada, and if you look at their declaration, it's 152 in the record, paragraph 8. If the supply of vessels eligible to transport scour protection material to the OCS were limited to the single vessel under construction by Great Lakes, these and other planned wind farm projects could become economically, uneconomic or logically impossible to meet. They don't say anything about Canada. They don't say anything about limiting it. They're just coming up with that argument now so they don't have to deal with it. We're going to read the declarations, believe me. Second, when you talk about whether it's imminent, in the record, and unfortunately I don't have the exact citation, but it's a ruling request of April 14, 2022, from Mr. Papavesis who is here. He's requesting a ruling, this is 2022, from Customs. You anticipate a project that we get in early 2023 and will conclude in early 2024. You state the project will occur in four discrete phases, cable installation, scour protection installation. You propose that each phase will be conducted by a non-coast-wise qualified vessel. When you talk about imminent, they themselves are asking Customs for a ruling that they will be allowed to use foreign flag vessels in this carriage of scour protection rock from one point to another. Now they're coming up two years later. Was this a hypothetical situation they were asking about? No. They were asking because they wanted to be able to use foreign flag vessels in this trade. That's why they're here. This shows you they're here. You're saying they were asking for a ruling. They were asking Customs for a ruling allowing them to use foreign flag vessels to carry scour. And you're analogizing the imminence that you have with the imminence that— Right. I mean, obviously it was imminent for them. Why is that an Article 3 issue? Well, it's an Article 3 issue because their question is whether we're going to face imminent competition when our vessel— They don't need to satisfy Article 3 standing to get relief from Article 2. I'm sorry? They don't need Article 3 standing to get a response from the second branch of government. Right, but they're making a factual assertion that supports our Article 3 standing here, a factual assertion to the agency that supports our Article 3 standing here because they themselves are asking for a ruling allowing foreign flag competition with our vessel. Another issue that was raised, Cooper v. Texas Alcoholic Beverage. They mentioned prospective— There was actual competition there, but they also mentioned prospective competition. But I will just say in terms of the factual record and whether this is a question of law, and that was your question, Judge Ho. In Cooper, the regulatory allowance of increased competition in a plaintiff's market qualifies as, quote, a clear injury in fact, and reintroduction of the regulatory restriction can redress the injury. And in Cooper, they said this is just a matter of economics. If you open a market up to foreign competition, it's going to harm the existing protected industry. It's just a matter of economics. You know, they talk about we didn't put in a declaration. I don't think we have to put in a declaration about basic economics. If you're opening up, any foreign flag operator in the world can come in and compete in this marketplace. That's going to harm us competitively. Cooper recognizes that as a matter of economics. And the reason we know it's imminent is not only because we're out there competing for contracts now with them, but because two years ago, API's own law firm asked Customs for Ruling, saying, we'd like to bring in these foreign flag competitors. Can we do it? I mean, that's more than imminent. I took their theory, the API's theory, to be just because they have an interest in the same type of letter ruling, doesn't mean you guys are in competition. No, but their interest is they would like to use our competitors against us. That's exactly what they're asking for here. And that's, again, that's why they're here. With respect to perspective, the two cases, there's Louisiana, EP Authority versus FERC. The lifting of such restrictions alone is generally sufficient, and courts have not required litigants to wait until increased competition actually occurs. That's 141F3 at 367. Associated gas distributors, competitors, quote, need not wait for specific illegal transactions to hurt them competitively. We heard a lot from my friend about transactions and projects, whatever that means, specifically this D.C. Circuit precedent. I understand it's not your court, but I don't think this is a case to create a circuit split on. Competitors need not wait for specific, allegedly illegal transactions to hurt them competitively. Absolutely clear. And then your own precedent that I finally found, Barber v. Bryant. Future injuries can provide the basis for standing when they're certainly impending and therefore constitute injury in fact. Okay. We appreciate it. Thank you. The case is submitted. We're going to take a brief recess, and then two of the panel will be back. Thank you all so much.